ST. LOUIS S. W. RY. CO. OF TEXAS v. BLEVINS et al.　(No. 5418.)

(Court of Civil Appeals of Texas. Austin. Nov. 25, 1914. Rehearing Denied Feb. 3, 1915.)

1. MASTER AND SERVANT ⬡284—ACTIONS FOR INJURIES—QUESTIONS FOR JURY.

In a railway section hand's action for injuries caused by a coemployé starting a hand car on which he was sitting after they had placed their tools in the section house for the night, evidence *held* to make a question for the jury as to whether he got upon the hand car, and the coemployé went upon the hand car and started it, for the purpose of taking it to the point to which they returned when their labors for the day were completed, or whether they were playing and pranking with the hand car.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1000–1090, 1092–1132; Dec. Dig. ⬡284.]

2. MASTER AND SERVANT ⬡180—LIABILITY FOR INJURIES — NEGLIGENCE OF FELLOW SERVANT—"OPERATING."

Within the statute abrogating the fellow servant doctrine when the injured party and his negligent fellow servant are engaged in the work of operating a car, the word "operating" does not require that the car should be actually moving at the time, or that the injured employé should at the particular time be actively engaged in the performance of manual or other labor.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 359–361, 363–368; Dec. Dig. ⬡180.

For other definitions, see Words and Phrases, First and Second Series, Operate.]

3. MASTER AND SERVANT ⬡180—LIABILITY FOR INJURIES — NEGLIGENCE OF FELLOW SERVANT.

Under the statute abrogating the fellow servant doctrine where the injured party and his negligent fellow servant are engaged in operating a car, if a section hand got upon a hand car for the purpose of assisting in taking it to the point to which the section employés returned when their labors for the day were completed, and a coemployé went upon the car and put it in motion for the same purpose, they were both engaged in operating the car, though

the section foreman had given them no specific order to take the car to such point.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 359–361, 363–368; Dec. Dig. ⬡180.]

Appeal from District Court, Coryell County; J. H. Arnold, Judge.

Action by L. J. Blevins and another against the St. Louis Southwestern Railway Company of Texas. From a judgment for plaintiffs, defendant appeals. Affirmed.

E. B. Perkins, of Dallas, Scott & Ross, of Waco, and Sadler & Cobb, of Gatesville, for appellant. Moore & Short, of Gatesville, for appellees.

KEY, C. J. In this case the plaintiff L. J. Blevins recovered a verdict and judgment against the defendant, St. Louis Southwestern Railway Company of Texas, for $75, and the plaintiff Ed Blevins got a like recovery for the sum of $337.50, and the railway company has appealed.

Ed Blevins was a minor, and L. J. Blevins was his father. The judgment in favor of the former was for personal injuries sustained by him, and the judgment in favor of the latter was for medical expenses incurred by him on account of the injuries to the former.

[1] Several questions are presented in appellant's brief, all of which have been duly considered, and are decided against appellant, but only one of which we deem it necessary to discuss in this opinion. That question is raised by the assignment which complains of the action of the trial court in refusing to give a requested instruction directing a verdict for appellant. In this case the injury complained of was caused by the negligence of Ben Cathey, a fellow servant. The defense of fellow servant was interposed, and counsel for appellant contend that the undisputed testimony brings the case within the doctrine of fellow servant, and therefore the court should have given the requested instruction directing a verdict for the defendant. Counsel for appellees contend that the case comes within the purview of a statute of this state which abrogates the defense of fellow servant when the injured party and his negligent fellow servant are engaged in the work of operating a car.

The proof shows that on the occasion in question the plaintiff Ed Blevins and Ben Cathey were fellow servants in appellant's employ as section hands. In appellant's brief the testimony bearing on the question under consideration is summarized as follows:

Ed Blevins testified:

"I got hurt on the 7th day of June. It was on the 7th day of June, one Saturday evening, and I was tightening bolts on the railroad, and that evening, after the 3 o'clock passenger train came by, he told us to put our tools on the car. That was Tucker, the foreman, that told us to do that. We loaded the tools on the car, and went to the section house and unloaded them, and put them in the tool house, and wired back

the door, and I was sitting down. The hand car at that time was standing in front of the tool house door. The hand car was on the track in front of the tool house door. We had gone up there, and had gone under instructions of the foreman, and had unloaded the hand car under his directions, and were waiting for further orders from him as to what to do next. It was not quitting time at that time. We had unloaded the car, and I was still under the foreman's instructions until we pulled into the Junction. The foreman lived at the Junction. My day's work is never complete until I pull the foreman into the Junction. That was part of my duty. On the date of my injury we had pulled up to· the section house and unloaded the tools and wired back the door; wired it up, you know. And I went and got me a drink of water, and was sitting down on the car, and told Tucker to 'Come on, and let's go.' I sat down there, and was waiting for further instructions from him what to do, and Ben Cathey was behind the car, and when I sat down he pushed the car with such force it caused me to fall backwards and caught my head under the bars. · Ben Cathey was there for the company, just the same as I was. He was working for the defendant company, just as same as I was. He was doing the same work I was doing. He was working as a section hand along with the section crew. He was under the same foreman that I was under. Ben Cathey at the time I was hurt was somewhere about 16 years old. I don't know of my own knowledge whether the section foreman knew that Ben and I were minors or not. I don't know whether he knew that Ben Cathay was a minor or not. The car was pushed south when I got hurt. We call it running north and south there by the section house. The car was pushed towards Leon Junction when I was hurt. I was not on the end that I always handle coming this way when I got hurt. I always pulled behind the handle bars. I did not know, nor have any warning, that that hand car was going to be pushed or shoved before it was pushed or shoved. No one told me that they were going to push it or shove it. I do not know how near the foreman was to the car when we got to the hand car and when I got hurt. He was away from the hand car. He was out somewhere sitting on one of those boards that runs from the car house out to the railroad that you walk from the railroad to the car house. It was about five minutes after the time I said, 'Come on, let's go to the Junction,' until I got hurt. I guess it was about 4:30 in the afternoon when I got hurt. I don't know what time we usually quit work before that day. I did not carry a watch. We usually quit at 6 o'clock. That was the time to quit, I think. We had about 2 and 2½ miles to go from the tool house to the Junction. It usually took about 10 minutes to ride that 2½ miles ordinarily. I had no particular object in getting back to the Junction that afternoon. No particular reason for telling the foreman, 'Come on, let's go to the Junction.' The foreman never said a word when I told him to 'Come on, and let's go to the Junction.' He had his back to me at the time I told him that. He had his back toward the car at that time. I was on the front end of the car, but my feet was not on the ground. My feet was hanging down towards the ground. No; I was not lying down on the hand car. No; I did not have my feet upon the car. For me to have been doing my duty, so far as operating the car, I would have had to got up on the car with my feet and turned around and took hold of the handle bars and went to work. That is what I would have done if I had not gotten hurt. When I sat down on the front end of the car, the handle bars were behind me. I was sitting up erect and straight when I got hurt; that is, I was when he shoved the car. The foreman was sitting at the place where I had left him

with his back to me when the car moved. Ben Cathey was at the back end of the car at that time. I did not hear Ben jump on the car. I heard no noise of any kind at all. Ben and I were down there as section hands, and were employed for the same character of work. We both did the same character of work in handling and operating the car. He and I did not work side by side all the time. In handling the car we had hold of the same handle bar as a rule. He and I generally worked behind together. I never did get on one end and he on the other end. He and I were together as we pulled the car up there. We were at the same end; in going back to the Junction that afternoon, if I had not got hurt, we would have worked side by side. We would have done that pulling the car back to the· Junction. I got hurt, and could not help pull it back at all. I don't know why I went to the front end and Ben to the back end that afternoon."

Mrs. Adams testified for plaintiffs:

"When they closed up the tool house, Ed Blevins was the first party to the hand car. He sat down on the car. His feet were swinging down between the rails, between the rails of the main track. Ed Blevins was not sitting up straight when the accident occurred, but was kinder leaning back that way. He was sitting on the end of the car towards Leon Junction. Ben Cathey was going from the tool house to the hand car when I first noticed him. The hand car at that time was standing still. Cathey pushed the back end of the car. As soon as the thing hit Ed, Ben pulled it off his head and relieved Ed from the position he was in. He pulled it down. Blevins got up then, and came around to Ben, and said, 'I would not thought you would have done that.' Ed told Blevins that he was as much to blame as he was. Blevins did not make any reply to that."

G. G. Adams, witness for plaintiffs, testified:

"The foreman had us put the hand car on the track when we were working to run up there. Yes; that was the usual and customary way we did in the afternoons. After we unloaded the car, Ed Cathey and Tucker used the car in going to their homes—in going to the Junction."

Ben Cathey, for plaintiffs, testified:

"We all had been at work that day, and came to the section house with the hand car, and put the tools up; and the way Ed got hurt, he was sitting down on the car, and me or Ed, one, started the car. Ed or I started the car. I may have started it myself, and I heard Ed holloa, 'Oh,' and I pulled the lever up off him. If I started the car myself, I was just kinder monkeying and fooling with it. I did not mean to say, if I did say it, that I started the car, if I did start it, that I was starting it for the purpose of going to the Junction at that time. I said I may have started the car. Ed might have started it. If I started it at that time, I was not starting it for the purpose of going to the Junction, but was just monkeying or fooling with the car."

Counsel for appellees in their brief have summarized the testimony as follows:

Appellee Ed Blevins, while upon the stand in his own behalf, testified as follows:

"I was working for the defendant company under Tucker as section foreman. I got hurt on the 7th day of June. It was on the 7th day of June, one Saturday evening, and I was tightening bolts· on the railroad, and that evening, after the 3 o'clock passenger train came by, he told us to put our tools on the car. That was Tucker, the foreman, that told us to do that. We loaded the tools on the car, and went to the section house, and unloaded them, and put them in the tool house, and wired back the door, and

I was sitting down. The hand car at that time was standing in front of the tool house door. The hand car was on the track in front of the tool house door. We had gone up there, and had gone under instructions of the foreman, and had unloaded the hand car under his instructions, and were waiting for further orders from him as to what to do next. It was not quitting time at that time. We had unloaded the car, and were still under the foreman's instructions until we pulled him into the Junction. The foreman lived at the Junction. My day's work is never complete until I pull the foreman into the Junction. That is a part of my duty. The foreman was not living at the section house at that time. We began work at the Junction, and went back to the Junction each night. That was our place of starting and returning. That is when my day's work was done. I went and got me a drink of water, and was sitting down on the car, and told Tucker to 'Come on, let's go,' and sat down there, and was waiting for further instructions from him what to do, and Ben Cathey was behind the car, and when I sat down he pushed the car with such force it caused me to fall backwards and caught my head under the bars. Ben Cathey was there for the company, just the same as I was. He was working for the defendant company in the same capacity that I was. He was doing the same work I was doing. He was working as a section hand along with the section crew. He was under the same foreman that I was under."

G. G. Adams, while a witness on the stand in behalf of plaintiffs, testified as follows:

"When I heard Ed say 'Oh!' Ben Cathey came around and was on the back end of the hand car, and had his hands on the handle bar levers. Ed Blevins was on end of the hand car towards the Junction. When I saw Ed, was standing in front of the car down on the track. The hand car was perfectly still when I looked up. Cathey was on the car. That is all I saw of the transaction. I began working on that section March 4th, and had made a pretty steady hand up to that time. Tucker, the foreman, was living in Leon Junction at that time. Tucker started from his home at Leon Junction, and returned back there at night. That was the beginning and ending of his day's work. We were returning to the Junction when the plaintiff got hurt. It was some between half past 4 and 5 o'clock when the accident occurred. It was not quitting time. It was not 6 o'clock. It was not quitting time, and we had not quit. We were all still on duty; yes, right there at that place where the accident occurred. * * * The foreman had us put up the hand car on the track when we were working to run up there. Yes; that was the usual and customary way which we did in the afternoons. After we unloaded the car, Ed [meaning plaintiff] and Cathey and Tucker used the car in going to their homes—in going to the Junction. The car was kept over there all night, there at the Junction. I hardly ever went with these parties to the Junction."

Mrs. Emma Adams, witness for plaintiffs, testified:

"I know Ed Blevins, one of the plaintiffs in this suit. I knew him the 7th day of June last year. I was living at that time at the section house; that is, the section house on the Cotton Belt Railroad; at the section house down by Leon Junction. I can tell how the boy got hurt. They came up to the section tool house and unloaded the tools. All of the section hands did that, and they left the hand car standing on the track, and they put all the tools off, and Ed went and sat down on the front end of the hand car, and Ben Cathey ran and closed the door, and went and jumped on the car, and pulled the lever down. He had to operate the car to do that. The car was traveling backwards, I

reckon. I would call it that way. It was going back towards the Junction. I know Mr. Tucker, the foreman of that crew. Tucker was living at the Junction at that time. It was customary for the hands to all come down to the tool house and leave the tools before they quit work. They would then go back to the Junction, to their homes, and stay all night. They did that all the time; that was their custom. The hand car was on the track that evening for that purpose of going back to the Junction. Ben Cathey was going from the tool house to the hand car when I first noticed him. The hand car at that time was standing still. Cathey pushed the back end of the car. I saw Ben get upon the car myself. I saw Ed Blevins at that time. He was still sitting on the end of the hand car."

Ben Cathey, witness for plaintiffs, testified:

"I know Ed Blevins. I was with Ed at the time he got hurt on the railroad. I was working for the defendant railroad company at that time as a section hand. I had been working for the company at that time about five days. That was the first work I ever did on the railroad as a section hand. I was about 14 years old at that time. Ed Blevins and myself and George Adams and the foreman was working on that section at that place. I had no experience whatever as a section hand, except those five days."

Redirect:

"Ed was on the end of the car towards the Junction. Ed and I had both gone to that car ready to start on to the Junction. We were going to the Junction. We both went to that car with the intention of going to the Junction just as soon as the foreman came on. We had not quit work that day. We were still on duty when Ed got hurt. That was the purpose I got on that car, to start to the Junction, and that is what I started it for, if I did start it."

Counsel for appellant contend that at the time the plaintiff Ed Blevins was injured he and his negligent fellow servant, Cathey, were not engaged in operating the car, and in support of that contention they cite Railway v. Howard, 97 Tex. 513, 80 S. W. 229, and several other cases in line with the Howard Case. Howard was an engineer, and at the time he was injured was on his way and near to the engine for the purpose of taking charge of it, but he was not actually in charge or assisting in its operation at that time; and some of the other cases cited by appellant come within the doctrine of that case, which holds that Howard and his fellow servant were not engaged in operating the engine.

In Railway v. Walton, 47 Tex. Civ. App. 43, 104 S. W. 415, the plaintiff, Walton, was an engineer in charge of a switch engine. One Greer was the fireman, and they carried the engine to a water tank, for the purpose of taking water. It was noon, the hour when the switching crew usually took lunch, and some of them were so engaged. The fireman, however, proceeded to fill the tank with water, and the engineer got down from the engine and was engaged in oiling its various parts. While doing so the fireman returned from the tender to the cab and opened the blow-off cock to clean out the boiler, and as a result of so doing large jets of steam and hot water were thrown upon the engineer,

and he was thereby injured; and the Court of Civil Appeals for the First District, in a strong opinion by Chief Justice Gill, held that the injury was inflicted while the engineer and fireman were engaged in operating the engine within the purview of the statute referred to.

In Freeman v. Shaw, 126 S. W. 53, the plaintiff was engaged with others in distributing ties along the railway track. The ties were placed on a car which was pushed along the track by the plaintiff and the other workmen, and the ties pulled or thrown off where needed, without stopping the car, if possible. It was the duty of the plaintiff to assist in starting, stopping, and moving the car, as well as throwing off the ties. While he was moving a tie thrown off, a coemployé caused another to slide off, which injured him; and it was held by the Court of Civil Appeals for the Sixth District that the plaintiff and his coemployé were engaged in operating a car within the meaning of the statute. In that case Mr. Justice Levy in a luminous opinion reviews most, if not all, of the former cases construing the statute referred to, and says that, while former decisions have made the law seem clear, the difficulty has been in determining its application in certain instances; and we concede that this case belongs in that difficult class.

We have a statute in this state which declares that the rule that statutes in derogation of the common law shall be strictly construed shall not prevail in this state, and that our statutory law shall be liberally construed for the purpose of accomplishing the object which the Legislature had in view. Keeping in mind that rule of construction, we think the Howard Case has construed the statute as strictly as any one has the right to demand, and we hold that this case does not fall within that class.

The court, in effect, instructed the jury that in order for the plaintiffs to recover the jury must find from the evidence, among other things, that on the occasion in question the plaintiff Ed Blevins had taken his position on the hand car to await the orders of his foreman, and with the intention of beginning his journey to the point from which the section hands in question began work, and to which they returned when their labors for the day were completed, and that while on the hand car his coemployé, Ben Cathey, without warning or notice to him, suddenly began to operate the hand car, thereby setting it in motion, etc. The court also instructed the jury that if they believed from the evidence that Ed Blevins was injured while he and Cathey, his coemployé, were playing and pranking with the hand car in question, without the knowledge and consent of their foreman, and out of the line of their duties and work as section hands, then to return a verdict for the defendant. Thus it will be seen that, in order to find a verdict for the plaintiffs, the court required the jury to find that the plaintiff and his coemployé, Cathey, were in fact engaged in operating the car within the line of their employment; and we are not prepared to say that the evidence did not justify the court in submitting that issue to the jury.

[2, 3] While in order to avoid the fellow servant doctrine, and bring a case within the purview of the statute, it is necessary that the injury should be inflicted while the two employés are engaged in operating a car or engine, the word "operating," as used in the statute, should not be construed as requiring that the car or engine should be actually moving at the time, or that the injured employé should, at the particular time, be actively engaged in the performance of manual or other labor. As an illustration, it is the duty of the fireman, under the directions of the engineer, to supply the engine with sufficient fuel to maintain the necessary amount of steam; but, as a general rule, it does not require continuous physical exertion to perform that duty, and some, and perhaps much, of the time the fireman is sitting still and doing nothing. Still it would seem absurd to hold that he, as well as the engineer, are not throughout the entire trip engaged in operating the engine. Nor is it correct to say that employés are not engaged in operating an engine or car, if they are moving the same without a specific order from the employé under whom they are working. So we hold that if, on the occasion in question, the plaintiff Ed Blevins was on the car for the purpose of assisting in carrying it back to its proper destination, and if his coemployé, Ben Cathey, with or without the consent of the foreman, got on the car and put it in motion for the purpose of carrying it to such destination for appellant railway company, then they were each and both engaged in operating the car at that time. That the plaintiff Ed Blevins got on the car for the purpose referred to is clearly shown by his own testimony. On direct examination Ben Cathey said:

"We both went to that car with the intention of going to the Junction, just as soon as the foreman came on. We had not quit work that day; we were still on duty when Ed got hurt. That was the purpose I got on that car, to start to the Junction, and that is what I started it for, if I did start it."

On cross-examination he stated that he did not mean to say that, if he started the car, he started it for the purpose of going to the Junction at that time, and said that if he started the car at that time it was not for the purpose of going to the Junction, but he was just "monkeying" or "fooling" with the car. The jury had the witness before them, and therefore were better qualified than we are to determine which of his contradictory statements was correct. A hostile and untruthful witness may sometimes inadvertently tell the truth, and afterwards undertake to hedge against it by saying that he did not mean what he had said. We do not

mean to say that the witness Ben Cathey belongs in that class, but he did state on direct examination that, if he started the car, he did so for the purpose of carrying it to the Junction; and although on cross-examination he made a different statement, the jury had the right, if they deemed it proper, to conclude that his former statement was true, and the latter was not true. Hence we hold that the trial court ruled correctly when it refused to direct a verdict for the defendant, and we also hold that there was testimony which supports the verdict of the jury.

As stated above, some other questions are presented in appellant's brief, all of which have been considered, and are decided against appellant.

No reversible error has been shown, and therefore the judgment is affirmed.

Affirmed.